IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | CASE NO.  1:08-cv-235 |
| LINDA WOOLF, *et al.*, ) ) | |
| Defendants. ) | |

<u>**MEMORANDUM OPINION**</u>

THIS MATTER is before the Court on Defendants Linda Woolf, David Gengler, Lashaico, Inc. ("Lashaico"), and Hands On Capital, Inc.'s ("Hands On Capital") Motion to Dismiss, under Federal Rule of Civil Procedure 12(b)(6), the Complaint filed by the Securities and Exchange Commission ("the SEC"). This case is about the SEC's complaint that Defendants carried out a scheme to dupe inexperienced investors into buying seminar packages and trading stocks with lies and misrepresentations about their background and expertise as traders. The SEC alleges that "Teach Me to Trade" ("TMTT") seminars, software, and mentoring sessions were marketed in free workshops for novice investors at hotels and in television infomercials. According to the SEC's Complaint, Defendants Woolf and Gengler, through independent

1

contractor relationships Defendants Lashaico and Hands On Capital had with entities associated with TMTT, violated § 10(b) of the Securities Exchange Act of 1934 ("the Act") and SEC Rule 10b-5 by lying about their expertise in securities investment, their financial success in the stock market, and investment services they sold in order to induce the novice investors to purchase TMTT packages and to trade in stocks using TMTT investment strategies and advice from TMTT instructors and mentors. The Complaint asserts that Woolf, as president of Hands On Capital, is an alter ego of Hands On Capital and that Gengler, as president of Lashaico, is that corporation's alter ego as grounds for holding Woolf and Gengler personally liable for the alleged fraud.

Defendants contend that the SEC fails to state a claim for securities fraud because the Complaint does not allege that Defendants induced investors to make any particular stock transaction and therefore Defendants' allegedly false statements were not made "in connection with the purchase or sale of securities," as required to state a claim under § 10(b) and Rule 10b-5. Defendants contend further that the SEC's Complaint does not set forth sufficient facts to support the SEC's "alter ego" claim and that the Complaint uses the "alter ego" label without factual allegations that would warrant piercing the corporate veil of limited liability.

There are two issues before the Court: (1) whether the SEC sufficiently pleads violations of § 10(b) of the Act and SEC Rule 10b-5 where the Complaint alleges that Defendants lied about their financial investment background and expertise and advised novice investors to trade securities in hotel seminars and televised infomercials; and (2) whether the SEC's Complaint sets forth sufficient facts to warrant piercing the corporate veil and holding Defendants Woolf and Gengler personally liable for the fraud allegedly committed under independent contractor

2

agreements between TMTT entities and corporate entities of which Woolf and Gengler were officers.

## I.    Background

The SEC brought this suit alleging that Defendants' involvement with "Teach Me to Trade" ("TMTT"), which encompassed hotel seminars and televised infomercials about trading securities where Defendants Woolf and Gengler misrepresented their background and expertise in trading securities and induced participants to trade securities, violated the anti-fraud provisions of § 10(b) of the Act and SEC Rule 10b-5.[1] The SEC moves the Court to permanently enjoin Linda Woolf, David Gengler, Lashaico, and Hands On Capital from such alleged fraudulent conduct and order these defendants to disgorge all gains made in connection with this conduct.

This case was brought on March 11, 2008 but was stayed pending resolution of a criminal case against Woolf and Gengler involving much of the same conduct at issue in this case. *See U.S. v. Gengler*, No. 1:08cr12, 2009 WL 5549225 (E.D. Va. Oct. 23, 2009). During the 16-day jury trial in that case, Woolf and Gengler moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. *Id.* at *1. On May 7, 2009, the defendants were convicted of conspiracy to commit mail and wire fraud and substantive wire fraud. *Id.* United States District Judge Anthony J. Trenga subsequently granted their motion for judgment of acquittal. *Id.* The

---

[1] The SEC has advanced this theory in at least one other recent case before the United States District Court for the Eastern District of Virginia, *U.S. Sec. & Exch. Comm'n v. Long Term-Short Term, Inc.*, No. 1:11cv1127 (E.D.Va. Nov. 8, 2011). In that case, the SEC alleged that defendants Long Term-Short Term, Inc., d/b/a BetterTrades, and Freddie Rick, as founder, co-owner, and manager of the company, violated § 10(b) of the Act and SEC Rule 10b-5 by falsely representing to seminar and workshop participants that instructors working for BetterTrades were "highly successful options traders" and that Rick had become wealthy through options trading. *Long Term-Short Term*, No. 1:11CV1127, Complaint at ¶¶ 1-5, Oct. 18, 2011, ECF No. 1. The SEC secured a consent judgment against the defendants in that case, under which the defendants were enjoined from further violations of § 10(b) and required to pay civil penalties pursuant to § 27(d)(3) of the Act. *Long Term-Short Term*, No. 1:11CV1127, Nov. 8, 2011, ECF Nos. 4, 5.

government's appeal to the United States Court of Appeals for the Fourth Circuit was dismissed on November 10, 2010, and Woolf and Gengler were acquitted.

Defendants' Motion to Dismiss the SEC's civil Complaint is now before this Court. In its Complaint, the SEC alleges the following facts, which are taken as true for the purposes of this motion under Rule 12(b)(6) only.

Linda Woolf and David Gengler appeared in televised infomercials and made presentations at workshops promoting personal mentoring services, software, and classes purported to assist users and participants in trading securities. Compl. ¶ 1. The workshops, titled "Teach Me to Trade" ("TMTT"), were held at various hotels across the country, and TMTT seminar and software packages were sold at these events for approximately $11,000 - $40,000. Compl. ¶ 20. TMTT has been owned by Whitney Information Network, Inc. ("WIN") since 2002. Compl. ¶ 11. Gengler was paid approximately $2.25 million to sell TMTT packages from 2002 to 2007 through an independent contractor relationship between Lashaico and entities affiliated with TMTT, including WIN. Compl. ¶¶ 7, 9. Woolf was paid approximately $4 million to sell TMTT packages from 2003 to 2006 through an independent contractor relationship between Hands On Capital and entitles affiliated with TMTT, including WIN.  Compl. ¶¶ 8, 10. Woolf is president of Hands On Capital, and Gengler is president of Lashaico. Compl. ¶¶ 9, 10. Lashaico and Hands On Capital's primary income has been commissions paid from WIN, which were typically 10% or 15% of sales at workshops. Compl. ¶¶ 9, 10, 33.

In their workshop and infomercial appearances, Woolf and Gengler lied and misrepresented their background and expertise as traders to convince potential investors in their workshop and television audiences that they could expect to make extraordinary profits trading securities if they purchased TMTT packages and followed TMTT trading strategies. Compl. ¶ 1.

4

Woolf and Gengler also urged potential investors to engage in securities transactions and provided specific advice about particular transactions. Compl. ¶ 1. As a result of Woolf and Gengler's presentations and inducements, investors traded in securities using TMTT strategies, and many of them lost money. Compl. ¶ 55, 56.

Among Woolf and Gengler's misrepresentations were that both were expert securities traders who had purchased TMTT packages and made extraordinary profits by trading securities using TMTT trading strategies. Compl. ¶¶ 2, 25, 36. Woolf and Gengler made specific sales pitches to inexperienced investors and claimed that they could show them how to make substantial income from trading securities. Compl. ¶¶ 16, 17, 29. In truth, neither Woolf nor Gengler had purchased TMTT packages, and, according to their federal income tax returns, neither made the substantial gains from trading that they had claimed to make during their workshop and infomercial appearances. Compl. ¶¶ 35, 36. Woolf has never declared a securities trading profit, and, despite his claims about success using option and short-term trading strategies, Gengler declared more short-term capital losses than short-term capital gains on his tax returns. Compl. ¶ 36. Neither Woolf nor Gengler disclosed that they were paid commissions to sell TMTT packages. Compl. ¶ 33.

Woolf and Gengler made several misrepresentations about their background. In a TMTT infomercial, Woolf represented that she had known nothing about stocks before attending TMTT workshops but, within a matter of weeks, replaced her entire income using TMTT trading methods. Compl. ¶ 16. She represented that she now made more money trading for 30 minutes a day than she had made in any of her prior careers. Compl. ¶ 16. Gengler claimed to have been in substantial debt before contacting TMTT but was now a successful trader who was able to spend most of his day with his family after a brief time trading each day. Compl. ¶ 17. Gengler also

made the false claim that he was sought out to direct trading in securities brokerage accounts and received a share of profits for this service. Compl. ¶ 27. At TMTT workshops, Woolf and Gengler made false claims that they had each gone into debt in order to purchase TMTT goods and services and urged members of their audiences to do the same. Compl. ¶¶ 23, 24, 26, 31.

Additionally, Woolf and Gengler made false claims about the success rate of former TMTT students and the accuracy of predictions of short-term stock market movements using TMTT strategies. Compl. ¶¶ 30, 37.

Having misrepresented their background and expertise as well as the success of TMTT strategies, Woolf and Gengler went on to advise and even urge investors to engage in actual securities transactions. Woolf and Gengler advised investors to open brokerage accounts and to trade securities within two weeks of the workshop and at least once per week thereafter. Compl. ¶¶ 39, 40. They also advised investors to increase the size of their securities trades in the weeks following the workshop. Compl. ¶ 41. Woolf and Gengler discussed and provided advice about specific securities and trading devices. Compl. ¶¶ 42, 45. They also encouraged investors to participate in TMTT mentoring sessions in which mentors would guide them through the process of buying and selling securities. Compl. ¶¶ 48, 49. Woolf and Gengler also explained how to open a brokerage account and advised their workshop students to misrepresent their level of experience in dealing with broker-dealers so that they would be permitted to apply TMTT trading strategies to their trades without resistance. Compl. ¶¶ 53, 54.

The SEC brought the present civil action against Woolf and Gengler individually as well as Hands On Capital and Lashacio under the theory that Woolf and Gengler's conduct in their workshop and infomercial appearances constituted securities fraud under § 10(b) of the Act and

SEC Rule 10b-5 and that Woolf and Gengler were alter egos of Hands On Capital and Lashaico, respectively. Compl. ¶ 60.

## II.   Standard of Review

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "Conclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995). Because the central purpose of the complaint is to provide the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests," the plaintiff's legal allegations must be supported by some factual basis sufficient to allow the defendant to prepare a fair response. *Twombly*, 550 U.S. at 556 n.3.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).

A Rule 12(b)(6) motion should be granted unless an adequately stated claim is "supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (internal citations omitted). *See also* Fed. R. Civ. P. 12(b)(6). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting

*Twombly*, 550 U.S. at 555). A complaint is also insufficient if it relies upon "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S. Ct. at 1949 (internal citations omitted).

Federal Rule of Civil Procedure 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Twombly*, 550 U.S. at 555 (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)), Rule 9(b) provides that, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b).

## III.   Analysis

Defendants' Motion to Dismiss is denied in part and granted in part. The Court denies Defendants' Motion to Dismiss on the grounds that the SEC has not shown that the activities pled were "in connection with" a securities transaction. The Court holds that the SEC has adequately pled violations of § 10(b) and Rule 10b-5 because its Complaint includes detailed allegations that Defendants made false statements to potential investors while inducing those investors to enter securities transactions. The Court grants Defendants' Motion to Dismiss with respect to Defendants Woolf and Gengler's personal liability for the alleged securities fraud. The Court holds that the SEC's Complaint does not contain sufficient pleading to support its alter ego theory for piercing the corporate veil and holding Defendants Woolf and Gengler personally liable for the alleged fraud because it does not include allegations that these individual defendants and their respective corporate entities were united by interest and ownership or that the individual defendants controlled and used the corporate entities to perpetuate the alleged fraud.

### A. Securities Fraud Under § 10(b) and Rule 10b-5

The Court denies Defendants' motion to dismiss for failure to state a securities fraud claim under § 10(b) and Rule 10b-5 because the SEC's Complaint contains factual allegations sufficient to support its claim that Defendants violated § 10(b) of the Act and SEC Rule 10b-5. "In a civil enforcement action under § 10(b), the SEC must establish that the defendant (1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities." *S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 239 (4th Cir. 2009), *cert. denied*, 130 S.Ct. 3506 (2010) (internal quotations omitted). See also 15 U.S.C. § 78j(b) (2010); 17 C.F.R. § 240.10b-5 (2010). The SEC's Complaint contains factual allegations that Defendants' conduct at TMTT workshops and in TMTT infomercials meet each of these elements of a § 10(b) violation.

#### 1. Falsity

First, accepting the allegations in the SEC's Complaint as true for the purposes of this motion, Defendants Woolf and Gengler lied and made several misrepresentations to potential investors. Making false statements constitutes a deceptive act that may bring a defendant within the scope of § 10(b) of the Act. *Pirate Investor*, 580 F.3d at 239-240. The SEC alleges that, during their appearances in TMTT advertisements and at TMTT workshops, Defendants Woolf and Gengler made false statements about their experience and expertise in trading securities and using TMTT strategies to become wealthy. Compl. ¶¶ 18, 25, 26. According to the Complaint, neither Woolf nor Gengler ever made significant profits from trading securities but, rather, they were salespersons for TMTT who were paid commissions to sell TMTT packages. Compl. ¶¶ 18, 36. The SEC also alleges that specific statements Woolf and Gengler made about going into substantial debt to purchase TMTT packages and the success rate of former TMTT students were

also false, as was Gengler's claims about being sought out to direct trading in securities

brokerage accounts. Compl. ¶ 23, 27. Thus, the SEC sufficiently pleads the falsity element of its

securities fraud claim against Defendants.

### 2. Materiality

Second, the SEC sets forth sufficient allegations that Woolf and Gengler's

misrepresentations were statements of material fact as required to plead a violation of § 10(b).

> [A] fact stated or omitted is material if there is a substantial likelihood that a
> reasonable purchaser or seller of a security (1) would consider the fact important
> in deciding whether to buy or sell the security or (2) would have viewed the total
> mix of information made available to be significantly altered by disclosure of the
> fact.

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir.1999). The SEC's Complaint contains

allegations that support the inference that a reasonable purchaser or seller of securities would

find false statements made by Woolf and Gengler important in deciding whether to buy or sell

securities. According to the Complaint, Defendants made presentations at workshops specifically

about securities investment strategies and specifically marketed to novice investors. Compl. ¶ 1.

During these presentations, Woolf and Gengler made misrepresentations to convince the

attending investors of their experience and expertise with using TMTT investment strategies and

with trading stocks generally. Compl. ¶¶ 3, 18. The SEC alleges further that Defendants'

misrepresentations induced investors to make actual purchases and sales of securities applying

the trading strategies advised by TMTT and that many investors lost money as a result of this

trading. Compl. ¶¶ 32, 55, 56. In their seminar appearances, Woolf and Gengler encouraged

investors to trade securities in their existing portfolios and promoted classes and mentoring

sessions in which investors would purchase and sell stocks under the advice and instruction of

mentors, who would help investors identify stocks to trade and guide investors through the

process of conducting actual trades. Compl. ¶¶ 43, 44, 48. Taking the allegations contained in the

SEC's Complaint as true, Woolf and Gengler's lies and misrepresentations were clearly offered in a context that would cause reasonable investors rely upon them. Further, the total mix of information made available to the investors attending Woolf and Gengler's workshops would have been significantly altered if the defendants had been truthful about their background and lack of expertise in trading stocks. *See Longman,* 197 F.3d at 683. Thus, the SEC adequately pleads the materiality element of a § 10(b) violation.

### 3.  Scienter

Third, the SEC adequately pleads the scienter element of its securities fraud claim. Within the meaning of § 10(b), "the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Scienter is established by a showing that the material misrepresentation or omission was made intentionally or recklessly. *Pirate Investor*, 580 F.3d at 241 (citing *Ottmann v. Hanger Orthopedic Grp., Inc.,* 353 F.3d 338, 343–44 (4th Cir.2003)). The SEC alleges that Defendants knew or should have known the falsity of their statements. Compl. ¶¶ 16, 17. The allegation that Defendants made false statements about debts they incurred purchasing TMTT services, their own expertise in securities trading, and their own success in trading securities supports the reasonable inference that Defendants knew that these statements were false. Compl. ¶¶ 22, 23. The SEC also adequately pleads that Woolf and Gengler should have known that statements they made about the success rate of TMTT students were false. Compl. ¶ 37. Thus, SEC sufficiently pleads that Defendants made false statements of material fact to potential investors with scienter.

### 4.  "In Connection with the Purchase or Sale of Securities"

Fourth, the SEC sets forth sufficient allegations that Woolf and Gengler's misrepresentations were made in connection with trade in securities as required to plead a violation of § 10(b).

The United States Supreme Court "has consistently embraced an expansive reading of § 10(b)'s 'in connection with' requirement." *Pirate Investor*, 580 F.3d at 244 (quoting *S.E.C. v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008)). *See also S.E.C. v. Zandford*, 535 U.S. 813, 819-820 (2002) (upholding SEC's broad construction of "in connection with the purchase or sale of any security[]" under § 10(b)). The "in connection with" element is met whenever "fraudulent activity . . . 'touches' or 'coincides' with a securities transaction." *Pirate Investor*, 580 F.3d at 244 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006)). *See also Zandford*, 535 U.S. at 823, 826. In *S.E.C. v. Pirate Investor LLC*, 580 F.3d 233, 244 (4th Cir. 2009), the Fourth Circuit attempted to clarify this standard by compiling a non-exhaustive list of factors that courts should consider to determine whether fraudulent activity "coincides" with a securities transaction:

> (1) whether a securities sale was necessary to the completion of the fraudulent scheme;
> (2) whether the parties' relationship was such that it would necessarily involve trading in securities;
> (3) whether the defendant intended to induce a securities transaction; and
> (4) whether material misrepresentations were disseminated to the public in a medium upon which a reasonable investor would rely.

The Fourth Circuit explained that "these factors are not mandatory requirements that a fraud must satisfy in order to meet § 10(b)'s 'in connection with' requirement[,]" but rather "[t]hey exist merely to guide the inquiry." *Id.*

> Moreover, a fraud need not satisfy all of the factors to be "in connection with" a securities transaction; a close fit with one factor may well be enough for a fraud to result in § 10(b) liability. The application of the factors should be rooted in the

understanding that the "in connection with" requirement is a flexible one and that questions concerning its scope are best examined on a case-by-case basis. *Id.* at 245. *See also Zandford*, 535 U.S. at 819 ("Section 10(b) of the Securities Exchange Act . . . should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes.") (quoting *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 151 (1972)) (internal quotations omitted).

The Court finds that the detailed factual allegations in the SEC's Complaint closely fit at least two of the four factors set out in *Pirate Investor* and therefore meet the broad and flexible "in connection with" standard of § 10(b). First, the Complaint includes sufficient factual allegations to support the SEC's claim that Woolf and Gengler's misrepresentations were intended to induce securities transactions. According to the Complaint, Woolf and Gengler encouraged and urged their workshop students to trade securities and to apply TMTT methods in this trading activity. Compl. ¶¶ 39-41. Defendants advised investors to trade securities in their existing portfolios, to open brokerage accounts, and to set deadlines by which they instructed potential investors to make actual trades. Compl. ¶¶ 39, 44. Woolf and Gengler even advised investors to sell their current securities in order to purchase TMTT packages so that they could trade using TMTT methods. Compl. ¶ 44. Defendants also promoted a TMTT class in which investors in the class would trade stocks for days under the advice of instructors who would help investors identify stocks to purchase or sell and TMTT mentoring services in which mentors would guide investors through the process of conducting actual trades. Compl. ¶¶ 43, 48. The SEC alleges that Defendants even recommended particular transactions, though the recommended securities are not specifically named in the Complaint. Compl. ¶ 42.

Second, the SEC alleges that Defendants' material misrepresentations were disseminated to the public in a medium upon which reasonable investors would rely. This fourth factor from

*Pirate Investor* for determining whether fraudulent activity was "in connection with" securities transactions asks whether Defendants "utilized a device that would cause reasonable investors to rely thereon and so relying, cause them to purchase or sell a corporation's securities." *Pirate Investor*, 580 F.3d at 248-249 (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (internal quotations omitted)). According to the Complaint, Woolf and Gengler's misrepresentations about their backgrounds were made to potential investors in person at hotel seminars open to the public and in broadcast television infomercials directed at potential securities investors. Compl. ¶¶ 1, 18. These workshops were a medium that would cause a reasonable investor to rely upon statements of fact made by speakers in making securities investment decisions. Additionally, the SEC alleges that, during their workshop appearances, Woolf and Gengler urged investors to make actual trades while explaining when and how these trades should be made. *See* Compl. ¶¶ 39-41. These factual allegations are sufficient to support the inference that Woolf and Gengler expected their workshop students to trade securities based on their misrepresented background and false expertise. Further, according to the Complaint, students made actual trades in securities after attending Defendants' presentations. Compl. ¶¶ 55, 56.

Thus, the Court holds that the SEC's Complaint contains adequate pleading that Woolf and Gengler's false statements were made with scienter and in connection with trade in securities. "[A] close fit with one [of the four factors discussed in that case] may well be enough for a fraud to result in § 10(b) liability[,]" *Pirate Investor*, 580 F.3d at 245, and, in the present case, the facts alleged in the SEC's Complaint provide a close fit to two of the factors. These allegations are sufficient to meet the broad and flexible "in connection with" element of a § 10(b) and Rule 10b-5 violation.

14

Defendants argue that the "in connection with" element of § 10(b) and Rule 10b-5 requires that statements alleged to constitute securities fraud pertain to *particular* securities, citing a set of cases that includes the Second Circuit Court of Appeals case *Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930 (2d Cir. 1980), and a number of later cases that cite *Chemical Bank*. In *Chemical Bank*, the Second Circuit held that "misrepresentations or omissions involved in a securities transaction but not pertaining to the securities themselves" cannot form the basis of a violation of § 10(b) or Rule 10b-5. 726 F.2d at 943. The Fourth Circuit Court of Appeals adopted this rule in *Head v. Head*, 759 F.2d 1172 (4th Cir. 1985), and held that misrepresentations alleged in that case were not connected with the specific transaction underlying the alleged violation of § 10(b) because those misrepresentations did not pertain specifically to the securities involved in the transaction. 759 F.2d at 1175-76.

However, the Supreme Court held subsequently, in *S.E.C. v. Zandford*, 535 U.S. 813, 821 (2002), that a fraudulent statement need not be made about the value of a particular security or involve manipulation of a particular security in order to violate § 10(b). None of the authorities Defendants cite supporting the proposition that a misrepresentation must pertain to particular securities in order to constitute fraud under § 10(b) postdate the 2002 *Zandford* decision. The text of § 10(b) of the Act and SEC Rule 10b-5[2] does not on its face require the SEC to name in

---

[2] Section 10(b) of the Act states that it is:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b)(2010).

SEC Rule 10b-5 states that it is:

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
>   (a) To employ any device, scheme, or artifice to defraud,

its Complaint particular securities which Defendants intended investors to trade or to allege that

Defendants' material misrepresentations concerned specific securities. Under both § 10(b) and

Rule 10b-5, a false statement may constitute a violation if it is made "in connection with the

purchase or sale of *any* security[,]" not any *particular* security. 15 U.S.C. § 78j(b); 17 C.F.R. §

240.10b-5 (emphasis added). Thus, having sufficiently alleged that Defendants, in making

material misrepresentations to potential investors, intended to induce trade in securities and

disseminated these misrepresentations in a medium upon which reasonable investors would rely,

the SEC has sufficiently pled that Defendants made these misrepresentations in connection with

transactions in securities within the meaning of § 10(b) and Rule 10b-5.

### 5.   "The Use of Any Means or Instrumentality of Interstate Commerce or of the Mails, or of Any Facility of Any National Securities Exchange"

Fifth, the SEC has pled sufficient facts to support the interstate commerce element of a §

10(b) violation. The issue raised by this element is whether the alleged fraud was effected

through "the use of any means or instrumentality of interstate commerce or of the mails, or of

any facility of any national securities exchange." 15 U.S.C. § 78j(b). The Supreme Court has

held that a wide variety of activities affects interstate commerce and that the means and

instrumentalities of interstate commerce encompass a broad range of devices used in economic

activity. *See, e.g., Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 1997), *cert. denied*, 523 U.S. 1136

(1998). The Complaint includes allegations that Defendants Woolf and Gengler appeared on

television and in front of potential investors in hotels across the country to disseminate their

---

       (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
       (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5 (2010).

material misrepresentations and induced others to trade securities. Compl. ¶¶ 13-17. Print ads,

direct mailings, and televised infomercials promoted the workshops at which Woolf and Gengler

appeared and committed their alleged fraud. Compl. ¶ 13. The SEC alleges further that

Defendants induced actual trades in securities that would require the use national securities

exchanges. Compl. ¶¶ 38-46. These factual allegations are sufficient to support a reasonable

inference that Defendants used a "means or instrumentality of interstate commerce or of the

mails" or a "facility of any national securities exchange" in conducting the alleged fraud.

 Thus, in its Complaint, the SEC adequately pleads that Defendants violated § 10(b) of the

Act and SEC Rule 10b-5. Accordingly, the Court denies Defendants' Motion to Dismiss the

SEC's Complaint for failure to state a securities fraud claim under § 10(b) of the Act and SEC

Rule 10b-5.

### B. The Alter Ego Theory for Piercing the Corporate Veil

 The Court grants Defendants' motion to dismiss the SEC's claims that Woolf and

Gengler were alter egos of the corporate defendants because the SEC has not set forth sufficient

facts to warrant setting aside the corporate shield of limited liability in this case. Paragraphs 9

and 10 of the Complaint assert an alter ego theory for holding the individual defendants liable for

the alleged misconduct of Defendants Hands On Capital and Lashaico, both Utah corporations.

However, this Court holds that the Complaint does not set forth facts regarding acts by the

individual or corporate defendants that would justify piercing the corporate veil in this case.

 A corporation is "an entity separate and apart from its officers and stockholders[.]" *Terry

v. Yancey*, 344 F.2d 789, 790 (4th Cir. 1965). *See also Dockstader v. Walker*, 29 Utah 370, 372

(1973) (corporation as "legal entity, separate and apart from its stockholders[]"). "[T]he decision

to pierce a corporate veil and expose those behind the corporation to liability is one that is to be

taken reluctantly and cautiously." *In re County Green Ltd. P'ship*, 604 F.2d 289, 292 (4th Cir. 1979). *See also Sloan v. Thornton*, 249 Va. 492, 498 (1995) ("Disregarding the corporate structure to impose liability on its shareholders or officers . . . is an extraordinary remedy . . . undertaken only when necessary to avoid an injustice."); *Puamier v. Barge BT 1793*, 395 F. Supp. 1019, 1038 (E.D. Va. 1974) ("corporate entity should be upheld unless specific, unusual circumstances call for looking beyond the corporate structure"); *N.L.R.B. v. Greater Kansas City Roofing*, 2 F.3d 1047, 1051 (10th Cir. 1993) ("corporate veil should be pierced only reluctantly and cautiously[]" and "[i]n extreme circumstances[]").

However, a court may pierce the corporate veil and hold individuals liable if the corporate entity is found to be "the *alter ego,* alias, stooge, or dummy of the individuals sought to be [held personally liable] and . . . a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Cheatle v. Rudd's Swimming Pool Supply Co., Inc.*, 234 Va. 207, 212 (1987). *See also Dockstader*, 29 Utah at 373 (describing alter ego theory for piercing corporate veil as applicable to situations "where one man owns practically all of the stock, either directly or through others who hold it for his use and benefit, and where the stockholder uses the corporation as a shield to protect him from debts or wrongdoings[]"); *Smith v. Grand Canyon Expeditions Co.*, 84 P.3d 1154, 1163 (Utah 2003) (describing alter ego theory for piercing corporate veil under Utah law). Under Virginia law, this alter ego theory must be supported by a showing that: (1) the individual and the corporation were united by interest and ownership; and (2) the individual "used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 434 (4th Cir. 2011) (quoting *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 306 F.3d 126, 132 (4th Cir. 2002) (internal quotations omitted)). *See also*

*O'Hazza v. Exec. Credit Corp.*, 246 Va. 111, 115 (1993) (piercing corporate veil is justified

when: (1) "the unity of interest and ownership is such that the separate personalities of the

corporation and the individual no longer exist and to adhere to that separateness would work an

injustice[;]" and (2) "one who seeks to disregard the corporate entity [shows that the individual]

sought to be held personally liable has controlled or used the corporation to evade a personal

obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair

advantage[]") (citing *Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 31-32 (1966)). The

same standard exists under Utah law and federal common law, allowing the corporate form to be

set aside "when [1] there is such unity of interest and ownership that the separate personalities of

the corporation and the individual no longer exist and [2] the observance of the corporate form

would sanction a fraud, promote injustice, or an inequitable result would follow." *Smith*, 84 P.3d

at 1163 (quoting *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979)

(internal quotations omitted)). *See also Greater Kansas City Roofing*, 2 F.3d at 1052.

  In this case, the SEC has not pled sufficient facts to support an alter ego theory that

would justify piercing the corporate veil and holding Defendants Woolf and Gengler personally

liable for the alleged securities fraud. In its Complaint, the SEC alleges that Woolf and Gengler

violated § 10(b) and Rule 10b-5 as officers of Hands On Capital and Lashaico, respectively,

which were independent contractors for TMTT entities. Compl. ¶¶ 9, 10. The SEC alleges that

Woolf was president of Hands On Capital and Gengler was president of Lashaico. Compl. ¶¶ 9,

10. The Complaint does not allege any contractual relationship between TMTT entities and

either Woolf or Gengler as individuals. According to the Complaint, "Gengler's appearances at

TMTT workshops were pursuant to an 'independent contractor' arrangement between Lashaico

and entities affiliated with TMTT." Compl. ¶ 9. The SEC alleges a similar contractual

relationship between TMTT entities and Hands On Capital with respect to the payment of Woolf's commissions from the sale of TMTT goods and services. Compl. ¶ 10.

The SEC claims that Hands On Capital is "Woolf's alter ego" and Lashaico is "Gengler's alter ego," Compl. ¶¶ 9, 10; however, these claims are mere labels and conclusory allegations that cannot survive a Rule 12(b)(6) challenge without further factual enhancement. *See Iqbal*, 129 S. Ct. at 1949 (pleading that "offers labels and conclusions or a formulaic recitation of the elements of a cause of action" and relies upon "naked assertions devoid of further factual enhancement" is insufficient); *Labram v. Havel*, 43 F.3d at 921. The SEC has not alleged facts satisfying either element required to pierce the corporate veil under an alter ego theory. The Complaint does not contain allegations that Woolf and Gengler and the respective corporate defendants of which they were officers were united by interest and ownership. The SEC's Complaint does not allege that Woolf and Gengler controlled and used the corporate entities in order to perpetuate securities fraud. *See Newport News Holdings Corp.*, 650 F.3d at 434; *O'Hazza*, 246 Va. at 115. The Complaint also fails to plead that "the observance of the corporate form [in this case] would sanction a fraud, promote injustice, or [result in an injustice]." *Smith*, 84 P.3d at 1163. That the individual defendants were officers of the corporate defendants is insufficient to support an alter ego theory that would justify setting aside the corporate fiction and holding the officers personally liable for the securities fraud alleged in the Complaint. *See Perpetual Real Estate Servs., Inc., v. Michaelson Props., Inc.*, 974 F.2d 545, 548 (4th Cir. 1992) (under Virginia law, "proof that some person may dominate or control the corporation, or may treat it as a mere department, instrumentality, agency, etc. is not enough to pierce the [corporate] veil[]") (quoting *Beale v. Kappa Alpha Order*, 192 Va. 382, 399 (1951)) (internal quotations

20

omitted); *Dockstader*, 29 Utah at 373 (reserving alter ego theory for situations "where the stockholder uses the corporation as a shield to protect him from debts or wrongdoings[]").

## IV.    Conclusion

The Court grants in part and denies in part Defendants' Motion to Dismiss the SEC's Complaint. The Court grants Defendants' Motion to Dismiss the SEC's claim for piercing the corporate veil and holding individual defendants Woolf and Gengler liable for the alleged securities fraud because the SEC's Complaint does not set forth sufficient facts to support its claim that the individual defendants are alter egos of the corporate defendants. The Court denies Defendants' Motion to Dismiss the SEC's claim for violations of § 10(b) of the Act and SEC Rule 10b-5 because the SEC's Complaint sets forth sufficient facts to state a claim against the defendants. Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss is DENIED in part and GRANTED in part. The motion is denied with respect to the claim of § 10(b) and Rule 10b-5 violations; however, the motion is granted with respect to the SEC's alter ego theory.

The Court has entered a stay of this case pending the Magistrate Judge's reexamination of the Scheduling Order in this case.

The Clerk is directed to forward a copy of this Order to Plaintiff and counsel of record.

ENTERED this _13th_ day of December, 2011.

Alexandria, Virginia
12 /13 / 2011

                                        /s/
                              Gerald Bruce Lee
                              United States District Judge